[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties, Lori Lavorgna and Robert J. Lavorgna, were married on May 23, 1986, in Prospect, Connecticut. This was their second marriage to each other, their previous marriage having been dissolved on April 2, 1986, seven weeks before their remarriage. They have continuously resided in Connecticut throughout their marriages.
The parties have five children issue of the marriage:
 Lisa M. Lavorgna, born March 17, 1975 Robert J. Lavorgna, Jr., born December 27, 1978 Matthew J. Lavorgna, born February 22, 1988 Lauren A. Lavorgna, born April 28, 1989 Lara A. Lavorgna, born April 28, 1989
The parties agree that the marriage has broken down irretrievably, and each so testified.
As to virtually all issues other than custody, the parties are in conflict, including over visitation, division of property, alimony and child support. Trial in this matter began on the afternoon of March 16, consumed all of the 17th and 18th, and concluded on the afternoon of March 19, 1993. The court heard the testimony of three psychologists, read the deposition testimony of a sexual assault crisis worker, and heard evidence from three babysitters, the defendant's employer, the parties themselves and the parties' oldest daughter, Lisa. Documents received in evidence were a report from Dr. Cheryl Outland, M.D., of the Waterbury Regional Department of Pediatrics, one short and one longer report from Dr. Howard M. Weinick (one of the psychologists who testified), and numerous records relating to the parties' finances.
I. The Marital Breakdown
From the evidence, the court was presented with a picture of a disorganized and tension-filled household, in which power CT Page 3044 struggles between the parents were commonplace. The subjects of these conflicts were the control of income and expenditures in the family, the interpersonal relationship of Ms. and Mr. Lavorgna, and the rearing of the children. The parents had frequent loud arguments, often in front of the children. Each directed vulgarities and demeaning language at one another, and, the court concludes, at the children. On at least one occasion, Mr. Lavorgna hit or pushed Ms. Lavorgna so that she fell to the ground. Not surprisingly in such an atmosphere, the older children became players in the power games as well, in an effort to deal with parents who often acted more as adolescents than as adults. Many of the witnesses chose the same word to characterize the family's life at home: chaotic.
The court does not find either party more significantly at fault for the failure of the marriage than the other. The court does find that the marriage has broken down irretrievably. A decree of dissolution shall enter.
II. Visitation
Initially after the parties' separation in November 1991, Lisa resided with her father, and the other children continued to reside in the family home with the plaintiff. After a period of counseling with Dr. Howard Weinick, who testified in this case, Robbie decided to move to the defendant's residence in March of 1992. The plaintiff was angry at this decision and has made no effort to maintain contact with Robbie since then. Robbie resents his mother's lack of emotional support and feels abandoned by her. These are issues being addressed in his ongoing therapy with Dr. Weinick. At this time, it is not in Robbie's interest to be the subject of court-ordered visitation with the plaintiff.
In May 1992, Ms. Lavorgna learned from her babysitter that one of the twins may have been inappropriately handled by Robbie while on a visit at the father's home. She denied visits for all three of the younger children with the defendant beginning in May 1992. The defendant did not press the issue for some weeks while consultations were ongoing.
In August 1992, the parties agreed to an order of weekly supervised visitation between the defendant and the three youngest children on Sundays from noon to 5 p.m. Still visitation did not occur, the defendant citing the plaintiff's failure to facilitate it by cooperating to find a suitable supervisor. CT Page 3045
In October and November 1992, the parties agreed on Dr. Thomas Houle, as an appropriate supervisor for these visits. Dr. Houle, a clinical psychologist, scheduled a number of visits on Sundays for the defendant and the three youngest children. Of the three visits which actually occurred, the most recent being six weeks before trial commenced, Dr. Houle testified that the children and their father enjoyed one another's company and that the interaction was appropriate and positive.
As to any contact between the younger children and their brother, Robert, Jr., the defendant offered the testimony of Dr. Sidney Horowitz, a clinical psychologist who performed a clinical evaluation of Robbie. Robbie had been referred to Dr. Horowitz by Dr. Outland, the physician to whom the original report of the May incident was made and to whom Ms. Lavorgna had taken her young daughter for a medical evaluation when Ms. Lavorgna learned of the allegation. Dr. Horowitz was of the opinion that Robbie presented no danger to others and expressed a degree of comfort in knowing that his professional opinion would be relied upon in determining future contact between Robbie and the twins.
The plaintiff, however, contends that absent complete assurance of safety, there should be no contact between Robbie and his younger siblings; that the defendant was often rough, abusive, and vulgar with the children; and that he cannot be trusted to properly care for or supervise the children on visits.
The court credits the witnesses offered by the defendant that no reason exists not to allow unsupervised contact between the defendant and Lara, Lauren, and Matthew. Further, contact between the three younger children and the two older children, Robbie and Lisa, should be allowed as the defendant sees fit, unrestricted in any artificial or supervised manner.
1. The parties have agreed that custody of Robert, Jr., known as Robbie, shall be with the defendant father, with whom Lisa also resides; and that custody of Matthew, Lara and Lauren shall be with the plaintiff mother. It is so ordered.
2. Visitation for Robert, Jr. with the plaintiff shall be in the discretion of the defendant, custodian of Robert, Jr. It is the court's hope that Robert, Jr. will continue to work with Dr. Howard Weinick to bring about Robert's ability to have contact with his mother, for his own good and for that of his siblings. CT Page 3046 But the court will not at this time order such contact to occur.
3. The defendant father shall have visitation with Lara, Lauren, and Matthew. The visitation shall not be supervised and the contact between the three younger children and their siblings is not restricted in any way. Specifically, the court finds that there is no danger or threat presented by Mr. Lavorgna or Robert, Jr. or Lisa which warrants any artificial supervision or restricted contact during visits with Lara, Lauren or Matthew.
Because of the conflicts previously exhibited between the parties over visitation, it is in the best interest of the children that a schedule for visits be established, leaving little to chance and little to discussion. That schedule is as follows:
a. Beginning on the Saturday following notice of this order, at 10:00 a.m., the father shall have visitation from Saturday at 10:00 a.m. until Sunday at 5:00 p.m. for three consecutive weekends. For the following two weekends, he shall have no visitation. Then the schedule shall repeat: three weekends with the father and two weekends with no visitation.
b. Notwithstanding the three-weekends-on, two-weekends-off schedule, the father shall also have the children for one week long visit in June, one in July and one in August, including terminal weekends, provided the week is one between two weekends on which visits with him would normally occur and provided he notifies the plaintiff in writing by May 28 of which weeks he elects for such visits.
c. If the defendant's weekend visitation with Matthew, Lauren and Lara falls on Thanksgiving in any year, he shall have visitation for that weekend beginning Wednesday of that week at 4:00 p.m.
d. The parties shall alternate Christmas Eve and Christmas Day with the children as follows: 1993 and odd years — the father shall have visitation from 10:00 a.m. Christmas morning until 4:00 p.m. New Year's Day. 1994 and even years: the father shall have visitation from December 21 at 4:00 p.m. until Christmas Day at 10:00 a.m.
III. Division of Property
The parties lived in a home at 3 Rozum Circle in Prospect for CT Page 3047 most of their marriage. This property was deeded to the plaintiff by her aunt for a promise to pay $4,000. The defendant planned and built a house on what was then a vacant lot, acting as a general contractor and doing substantial portions of the labor himself. The title to the property remained in the name of the plaintiff, however.
At the time of their first divorce, the parties agreed to allow the plaintiff to retain title. They agreed to divide some other funds so that each was to receive $20,000, although no documents were produced at trial evidencing such division. After the parties' remarriage, the defendant, with the participation of the plaintiff, undertook extensive repairs and renovations of the home. Although title was never joint, the parties both treated the home as a joint abode and a joint investment.
In 1992, after the separation, the plaintiff made the unilateral decision to sell the property. The net sum of $119,593.23 was realized from the sale. Of this, $65,941.88 was placed in escrow pendente lite with the remainder paid over to the plaintiff. The plaintiff retained all of the household furnishings, some of which she sold for a modest sum.
In view of all the factors cited in Conn. Gen. Stat. 46b-81
and in view of the evidence presented, the court orders the following division of property:
1. Subject only to the payment of counsel fees for the minor children, the funds held in escrow shall be divided 50% each to the plaintiff and to the defendant.
2. Each shall retain the checking, savings, deferred compensation, IRA, or other pension account which now stands in her/his sole name, free of any claim or demand by the other.
3. The 1990 Cadillac Seville shall be the sole property of the wife, and the 1991 Mazda Navajo shall be the sole property of the husband.
4. The plaintiff shall restore the sum of $12,962.68 for Lisa and $12,397.50 for Robert, Jr., as agreed, to accounts for each child. Those sums together with the remaining sums for Robert, Jr., which were in account #75012703 at the Waterbury Teachers Federal Credit Union as of 12/31/92 shall be transferred to the defendant as custodian for Lisa and Robert, Jr., respectively. CT Page 3048
IV. Assignment of Liabilities
1. The plaintiff shall pay the debt, if any, to Helen Charron listed on her financial affidavit, and shall indemnify and hold the defendant harmless from payment for any such debt.
2. Any outstanding medical bills of the children shall be promptly delivered to the defendant for submission to the family's health insurance carrier and upon submission of copies of such health insurer's action to plaintiff, each party shall within ten (10) days pay 50% of any remaining uninsured or unreimbursed amounts to the creditor health provider.
3. The defendant shall pay all other debts listed on his financial affidavit and shall indemnify and hold the plaintiff harmless from payment of any such debts.
4. Each party shall be responsible and shall pay any capital gains tax owed as a result of the sale of the Prospect property in proportion to the amount of the proceeds each received from the sale. For this purpose, the payment of counsel fees in Section VI shall be considered to have been paid one half by each party.
V. Alimony and Child Support
Although the plaintiff has worked in the past, events involving the breakup of the marriage began to overwhelm her and she quit or took a leave of absence from her position as a registered nurse in July 1992. Prior to that she had a good work and earnings record. In 1990, she grossed $47,418.
The defendant has worked as an independent contractor in the field of sales for companies that manufacture polishing equipment. Beginning in 1992, as a result of a general decline in that sector of the economy, he signed on as a regular employee of one such company as a sales representative. He earns $45,000 a year, taken as a draw against commissions.
The court finds the plaintiff's current earning capacity to be $45,000 per annum. The court finds that defendant's current earning capacity to be $45,000 per annum.
Considering all of the factors cited in Conn. Gen. Stat.46b-82, the court awards no alimony to either party. CT Page 3049
Taking into account the parties' requests regarding child support, the child support guidelines, the fact that an adjustment should be made because custody of the children is split between the parents, and all of the factors cited in Conn. Gen. Stat.46b-84, the court orders the defendant to pay to the plaintiff the sum of $70 per week per child for Lauren, Matthew and Lara. In addition, the defendant shall provide health insurance coverage for the minor children as available through his employment. In the event such is not available, then the plaintiff shall provide health insurance for all of the minor children as available through her employment. Any uninsured and unreimbursed health care costs for the minor children, including costs for psychotherapy, dental care, eye care and prescription medication shall be shared equally by the plaintiff and defendant.
VI. Counsel Fees
The court approves the request for counsel fees submitted by Richard M. Marano, attorney for the minor children, and finds the time spent and the hourly rate to be reasonable. Counsel fees of $4,768.20 shall be paid to Attorney Marano out of the escrow account referred to in Section IV above prior to the distribution of the funds to the plaintiff and defendant. Each party shall be responsible for counsel fees to each party's respective counsel.
VII. Preparation of Documents
Each party shall promptly execute all documents necessary to effectuate the court's orders. Counsel for the plaintiff shall promptly draft a judgment file for the court's signature. Counsel for the defendant shall promptly thereafter cause a copy of such order to be delivered to Troop I, Connecticut State Police in Bethany.
/s/ Patty Jenkins Pittman, J. PATTY JENKINS PITTMAN CT Page 3050